UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

SIERRA CLUB,
WEST VIRGINIA HIGHLANDS CONSERVANCY,
OHIO VALLEY ENVIRONMENTAL COALITION,
and COAL RIVER MOUNTAIN WATCH,

        Plaintiffs,

v.                              Civil Action No. 2:10-00673

ELK RUN COAL COMPANY, INC.,
INDEPENDENCE COAL COMPANY, INC.,
MARFORK COAL COMPANY, INC.,
PEERLESS EAGLE COAL COMPANY, and
POWER MOUNTAIN COAL COMPANY,

        Defendants.

MEMORANDUM OPINION AND ORDER

        This action arises under the Federal Water Pollution
Control Act, 33 U.S.C. §§ 1251 through 1387, commonly referred to
as the Clean Water Act, and the Surface Mining Control and
Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. § 1201 through 1328.
According to plaintiffs, between April 10, 2008, and December 31,
2009, the defendants in this action accrued at least 3,307 days
of violations of the Clean Water Act and SMCRA as a result of
their unlawful discharges of pollutants into the waters of the
United States.  Pending is the defendants' motion, filed July 6,
2010, to dismiss plaintiffs' complaint for lack of subject matter
jurisdiction.

I.

Plaintiffs' claims are brought pursuant to the provisions for "citizen suits" found in section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), and section 520(a) of SMCRA, 30 U.S.C. § 1270(a).  What follows first is an overview of the statutory and regulatory schemes in place under the Clean Water Act and SMCRA.[1]

A.   Clean Water Act

The Clean Water Act was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To this end, section 301(a) makes the discharge of "pollutants"[2] from a "point source"[3] into the waters of the United States unlawful unless the discharger complies with certain enumerated sections of the Clean Water Act.  One such enumerated provision is section 402, 33

---

[1] Part I of this memorandum opinion and order is largely taken from this court's decision in <u>Sierra Club v. Powellton Coal Co., LLC</u>, 662 F. Supp. 2d 514 (S.D. W. Va. 2009), which also addressed a motion to dismiss in the context of the Clean Water Act and SMCRA.

[2] <u>See</u> 33 U.S.C. § 1362(6).

[3] <u>See</u> 33 U.S.C. § 1362(14).

U.S.C. § 1342, which embodies the National Pollution Discharge
Elimination System ("NPDES") permit program, "[t]he cornerstone
of the Clean Water Act's pollution control scheme . . .."
Natural Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency, 822
F.2d 104, 108 (D.C. Cir. 1987).

        The issuance of a NPDES permit does not authorize the
recipient to pollute at will.  All NPDES permits authorizing the
discharge of pollutants are conditioned upon satisfaction of the
applicable requirements of the Clean Water Act.  33 U.S.C. §
1342(a)(1) and (b)(1).  Section 301(b)(1) of the Clean Water Act
requires that "every permit contain (1) effluent limitations that
reflect the pollution reduction achievable by using
technologically practicable controls and (2) any more stringent
pollutant release limitations necessary for the waterway
receiving the pollutant to meet 'water quality standards.'"
Piney Run Pres. Ass'n v. County Comm'rs, 268 F.3d 255, 265 (4th
Cir. 2001) (quoting Am. Paper Inst., Inc. v. U.S. Envt'l. Prot.
Agency, 996 F.2d 346, 349 (D.C. Cir. 1993)).[4]  NPDES permits also

---

        [4] Section 502(11) of the Clean Water Act defines "effluent
limitation" as "any restriction established by a State or the
Administrator [of the EPA] on quantities, rates, and
concentrations of chemical, physical, biological, and other
constituents which are discharged from point sources into
navigable waters . . . ."  33 U.S.C. § 1362(11).  Section
                                                (continued...)

3

require the holder to establish and maintain records; install,
use, and maintain monitoring equipment; sample point source
effluent; and submit "discharge monitoring reports" ("DMRs") at
regular intervals specified in the permit.  33 U.S.C. §
1318(a)(4)(A); 40 C.F.R. § 122.41(l)(4).  "Noncompliance with a
permit constitutes a violation of the [Clean Water] Act."
Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,
528 U.S. 167, 175 (2000) (citing 33 U.S.C. § 1342(h)).

        While the Environmental Protection Agency ("EPA") is
charged with administering the NPDES program, it is empowered to
delegate this authority to individual states.  33 U.S.C. §
1342(b).  Once the EPA approves a state's proposed NPDES program,
the EPA suspends its issuance of NPDES permits as to discharges
subject to the state program.  33 U.S.C. § 1342(c)(1).  On May
10, 1982, the EPA approved West Virginia's NPDES program, 47 Fed.
Reg. 22,363 (May 24, 1982), which is administered by the West
Virginia Department of Environmental Protection ("WVDEP").  See
Water Pollution Control Act, W. Va. Code §§ 22-11-1 through 29.

---

[4](...continued)
303(a)(3)(a), 33 U.S.C. § 1313(a)(3)(A), requires states to adopt
water quality standards.  "A water quality standard (WQS) defines
the water quality goals of a water body, or portion thereof, by
designating the use or uses to be made of the water and by
setting criteria necessary to protect the uses." 40 C.F.R. §
130.3.

Permits issued under the West Virginia NPDES program are known as West Virginia National Pollution Discharge Elimination System ("WV/NPDES") permits.

The EPA, states, and private citizens all play a role in enforcing the Clean Water Act.  Section 505(a)(1) authorizes "citizens"[5] to commence a civil action "against any person . . . who is alleged to be in violation of  . . . an effluent standard or limitation under this chapter . . .."  Section 505(f) provides, "[f]or purposes of this section, the term 'effluent standard or limitation under this chapter' means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title [section 301(a)]; . . . [or] (6) a permit or condition thereof issued under section 1342 of this title [section 402] . . .."  Section 505(a) authorizes "federal courts . . . to enter injunctions and assess civil penalties, payable to the United States Treasury, against any person found to be in violation of 'an effluent standard or limitation' under the Act." Envtl. Conservation Org. v. City of Dallas, 529 F.3d 519, 526 (5th Cir. 2008).

---

[5] Section 505(g) defines "citizen" as "a person or persons having an interest which is or may be adversely affected."

5

While violation of the terms of a NPDES or WV/NPDES permit exposes the permit holder to the possibility of a citizen suit, the right to bring a citizen suit is not without limits. Pursuant to section 505(b), a citizen suit under 505(a)(1) cannot be commenced until sixty days after the plaintiff gives notice of the alleged violation to the administrator of the EPA, the state where the alleged violation is occurring, and to the alleged violator.  Section 505(b) provides further that "[n]o action [under section 505(a)] may be commenced . . . if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order . . . .."  As will be seen, the applicability of section 505(b) to the facts of this action is in sharp dispute.

B.   Surface Mining Control and Reclamation Act

SMCRA is a comprehensive statute "enacted to strike a balance between the nation's interests in protecting the environment from the adverse effects of surface coal mining and in assuring the coal supply essential to the nation's energy requirements."  Bragg v. W. Va. Coal Ass'n., 248 F.3d 275, 288 (4th Cir. 2001) (citing 30 U.S.C. § 1202(a),(d),(f)); see also

6

Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 269 (1981).  These ends are accomplished through a system of "'cooperative federalism,' in which responsibility for the regulation of surface coal mining in the United States is shared between the U.S. Secretary of the Interior and State regulatory authorities." Bragg, 248 F.3d at 288 (citing H.R. Rep. No. 95-218, at 57 (1977), reprinted in 1977 U.S.C.C.A.N. 593, 595). Under section 503 of SMCRA, once a state's proposed program for the regulation of surface coal mining is approved by the Secretary of the Interior as satisfying SMCRA's minimum requirements, the state assumes "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations" on non-federal lands within the state.  West Virginia received such federal approval in 1981, 30 C.F.R. § 948.10, and its surface mining program is administered by the WVDEP. See West Virginia Surface Coal Mining Reclamation Act ("WVSCMRA"), W. Va. Code § 22-3-1 through 32a.

        Section 506(a), the heart of SMCRA, prohibits surface coal mining by any person "unless such person has first obtained a permit issued by such State pursuant to an approved State program or by the Secretary pursuant to a Federal program . . .." Pursuant to section 515(a), permits issued under either an

approved state program or the federal program, "shall require
that such surface coal mining operations will meet all applicable
performance standards of this chapter, and such other
requirements as the regulatory authority shall promulgate."[6]
Similarly, the WVSCMRA provides that "[a]ny permit issued by the
director pursuant to this article to conduct surface mining
operations shall require that the surface mining operations meet
all applicable performance standards of this article and other
requirements set forth in legislative rules proposed by the
director." W. Va. Code § 22-3-13(a).  In turn, W. Va. Code R. §
38-2-3.33c provides that "[t]he permittee shall comply with the
terms and conditions of the permit, all applicable performance
standards of the Act, and this rule."

Like the Clean Water Act, SMCRA contains a "citizen
suits" provision.  Section 520(a) provides that "any person
having an interest which is or may be adversely affected may
commence a civil action on his own behalf to compel compliance
with this chapter . . . against any . . . person who is alleged
to be in violation of any rule, regulation, order or permit

---

[6] SMCRA defines "regulatory authority" as "the State
regulatory authority where the State is administering this
chapter under an approved State program or the Secretary [of the
Interior] where the Secretary is administering this chapter under
a Federal program."  30 U.S.C. § 1291(22).

issued pursuant to this subchapter . . ..."  Unlike the Clean

Water Act, however, section 520(a) of SMCRA does not authorize

the imposition of civil penalties; citizens are only allowed to

file suit in order to compel compliance with SMCRA.[7]  While, as a

general rule, section 520(a) affords a cause of action to compel

compliance with performance standards incorporated into SMCRA

permits issued by authorized states such as West Virginia,[8]

section 702(a) of SMCRA provides that "[n]othing in this chapter

shall be construed as superceding, amending, modifying, or

repealing" the Clean Water Act or state laws enacted pursuant to

it.


                              II.


        Plaintiffs, the Sierra Club, West Virginia Highlands

Conservancy, Ohio Valley Environmental Coalition, and Coal River

---

[7] SMCRA requires plaintiffs to give notice of alleged
violations to the Secretary of the Interior, the state, and the
alleged violator sixty days prior to filing suit.  30 U.S.C. §
1270(b)(1)(A).  "[I]f the Secretary [of the Interior] or the
State has commenced and is diligently prosecuting a civil action
in a court of the United States or a State to require compliance
with the provisions of this chapter, or any rule, regulation,
order, or permit issued pursuant to this chapter," a citizen suit
cannot be commenced.  30 U.S.C. § 1270(b)(1)(B).

[8] Surface coal mining permits issued by the WVDEP pursuant
to its authority under SMCRA and the WVSCMRA will be referred to
as "WVSCMRA permits."

9

Mountain Watch, are non-profit organizations committed to the protection of the environment in West Virginia and elsewhere. (Compl. ¶¶ 23-26).  On April 27, 2010, plaintiffs initiated this action against defendants Elk Run Coal Company, Inc. ("Elk Run"), Independence Coal Company, Inc. ("Independence"), Marfork Coal Company, Inc. ("Marfork"), Peerless Eagle Coal Company ("Peerless"), and Power Mountain Coal Company ("Power Mountain") (collectively, "defendants"), alleging thousands of violations of the Clean Water Act and SMCRA.  As noted, defendants have moved to dismiss, contending that this court is without jurisdiction to entertain plaintiffs' suit.  To better understand defendants' contention, it is first necessary to review a separate enforcement action initiated by the United States in May 2007 against defendants and other coal companies.

A.    The 2007 EPA Enforcement Action

        On May 10, 2007, the United States commenced a civil enforcement action on behalf of the EPA (the "EPA enforcement action"), alleging that Massey Energy Company ("Massey") and certain of Massey's subsidiaries, including all five of the defendants herein (collectively, the "Massey defendants"), had contravened the Clean Water Act by discharging pollutants in excess of the effluent limitations set forth in their NPDES

permits.[9]  See <u>United States v. Massey Energy Co.</u>, No. 2:07-cv-
00299 (S.D. W. Va. filed May 10, 2007) (hereinafter "<u>U.S. v.</u>
<u>Massey Energy</u>").  Specifically, as pertinent here, the United
States alleged in the EPA enforcement action that, between
January 2000 and December 2006,

> (1) Elk Run violated the limitations of WV/NPDES permit
> number WV1003968, which regulates discharge from its White
> Castle Surface Mine;
>
> (2) Independence violated the limitations of WV/NPDES permit
> number WV1016024, which regulates discharge from its Jacks
> Branch Buffalo Mine;
>
> (3) Marfork violated the limitations of WV/NPDES permit
> number WV1013301, which regulates discharge from its Coon
> Hollow No. 1 Mine, Coon Hollow No. 2 Mine, Coon Hollow No. 3
> Mine, Coon-Cedar Grove Deep Mine, Slip Ridge No. 2 Gas Deep
> Mine, Beetree Powellton Deep Mine, Slip Ridge Powellton Deep
> Mine, and Slip Ridge Cedar Grove Mine;
>
> (4) Marfork further violated the limitations of WV/NPDES
> permit number WV1014838, which regulates discharge from its
> Low Gap-Lower Cedar Grove Mine No. 1;

---

[9] The EPA enforcement action alleged Clean Water Act
violations against Massey and twenty-seven of its subsidiaries.
Elk Run, Independence, Marfork, Peerless, and Power Mountain were
all named as defendants in the EPA enforcement action.

(5) Peerless Eagle violated the limitations of WV/NPDES

permit number WV1002040, which regulates discharge from its

Mine No. 15;

(6) Peerless Eagle further violated the limitations of

WV/NPDES permit number WV1014587, which regulates discharge

from its Lilly Fork Surface Mine; and

(7) Power Mountain violated the limitations of WV/NPDES

permit number WV0091405, which regulates discharge from its

Jones Branch Loadout Complex.

See U.S. v. Massey Energy, Docket No. 1, Appendix A-1, A-2, B-1,

B-2 (May 10, 2007).  Based on these and other violations, the

United States sought injunctive relief to halt the alleged

illegal discharges and substantial civil penalties.

On January 17, 2008, the United States lodged a

proposed consent decree (hereinafter, "Massey Consent Decree" or

"Decree"), purporting to resolve all of the United States' claims

against the Massey defendants.  See U.S. v. Massey Energy, Docket

No. 49, Ex. 1 (Jan. 17, 2008).  Regarding the injunctive relief

sought, the Massey defendants agreed to amend their Environmental

Assurance Manual in a manner contemplated to prevent illegal

discharges of total suspended solids, aluminum, manganese, iron,

and acidic or alkaline water from Massey's coal mining

12

facilities.  Id. ¶ 23.  The Massey defendants further agreed to implement an electronic discharge monitoring report tracking system, the results of which would reveal any effluent violations related to their NPDES permits.  Id. ¶¶ 24-25.  The Massey Consent Decree also required that the Massey defendants perform general environmental and site-specific audits of the treatment systems at their facilities.  Id. ¶¶ 29-30.

In addition to the foregoing injunctive relief designed to assure compliance with the Clean Water Act, the Massey Consent Decree required that the Massey defendants pay a $20 million civil penalty.  Id. ¶ 13.  Moreover, the Massey defendants agreed to a tiered system of stipulated penalties for future violations of the Decree's terms and overages relating to NPDES permits. Id. ¶ 55-67.  For example, in the event one of the Massey defendants failed to comply with the Decree, that defendant would face a $1,000 penalty per violation per day for the 1st through the 14th days; a $2,500 penalty per violation per day for the 15th through the 30th days; and a $4,500 penalty per violation per day for the 31st day and beyond.  Id. ¶ 56.  The Decree mandated a similar system of stipulated penalties for non-compliance with NPDES permit limits.  Id. ¶ 66.

Notably, the Massey Consent Decree resolved the Massey defendants' civil liability only for the violations alleged through the date of its lodging.  Id. ¶ 87.  The United States reserved its right to pursue actions for any violations by the Massey defendants that were not alleged in the complaint or that occur after January 17, 2008.  Id. ¶ 89.  The Decree further provided that it did "not limit the rights of third parties, not party to this Consent Decree, against [the Massey defendants], except as provided by law."  Id. ¶ 91.  Finally, the Massey defendants agreed that their "compliance with this . . . Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein."  Id. ¶ 90.

The lodging of the Massey Consent Decree triggered a public notice and comment period, during which plaintiffs in this action submitted comments regarding the Decree's preclusive effect.  See U.S. v. Massey Energy, Docket No. 56, at 10 (Mar. 18, 2008).  As pertinent here, plaintiffs sought confirmation from the United States that the Decree "does not prevent citizen suits against [the Massey defendants] for future violations of the Clean Water Act."  Id. at 11.  In response, the United States reiterated that the Decree resolved only "the civil claims of the

14

United States for violations alleged in the Complaint . . .,
filed May 10, 2007, through the date of lodging on January 17,
2008," and that the Massey defendants could not assert compliance
with the Decree as a defense to any action not addressed therein.
Id.  Accordingly, the United States concluded that "the Decree
would not prevent the United States, States, or any other
entities including citizens from pursuing violations that were
not alleged in the Complaint or occurred after January 17, 2008,
the date of lodging."  Id.

On April 9, 2008, this court granted the United States'
unopposed motion to enter the Massey Consent Decree, finding the
Decree to be fair, adequate, and reasonable.  See U.S. v. Massey
Energy, Docket No. 61, at 16-17 (Apr. 9, 2008).  In so doing, the
court emphasized the United States' contention that the Decree
would significantly reduce discharges of pollutants into the
waters of West Virginia and Kentucky.  Id. at 10.  The court
reviewed the injunctive relief and civil penalties set forth in
the Decree, as well as the public comments received and the
United States' responses thereto, and concluded that the Decree
served the public interest.  Id. at 10-12, 14-17.  Accordingly,
the court entered the Decree and dismissed the EPA enforcement
action.  Id. at 17.

B.    Plaintiffs' Civil Suit

        Notwithstanding the EPA enforcement action, defendants
continued to discharge pollutants in excess of the effluent
limitations set forth in their WV/NPDES permits, in contravention
of both the Clean Water Act and the Massey Consent Decree.
Seeking to comply with the notice requirements of the Clean Water
Act and SMCRA, on January 7, 2010, plaintiffs sent a notice of
intent letter ("NOI") to, among others, the president of Elk Run,
S. Craig Boggs; the president of Independence, Billy R. McCoy;
the president of Marfork, Christopher L. Blanchard; the president
of Peerless Eagle, David C. Hughart; the president of Power
Mountain, Michael Calloway; the Secretary of the WVDEP, Randy
Huffman; the Acting Regional Administrator of Region III of the
EPA, William Early; the Secretary of the U.S. Department of the
Interior, Ken Salazar; the federal Director of the Office of
Surface Mining Reclamation and Enforcement, Joseph Pizarchik;
Defendants' registered agent, Massey Energy Services Legal
Department; and the federal Regional Director for the Appalachian
Region of the Office of Surface Mining Enforcement and
Reclamation.  (Id. ¶ 96).  The NOI informed defendants that they
were in ongoing and continuing violation of the conditions set
forth in their WV/NPDES and WVSMCRA permits.  (Pls.' Mot. for

16

Partial Summ. J., Ex. 16, at 3-4).  Defendants were further
informed of plaintiffs' intent to sue for these violations at the
end of the sixty-day statutory notice period.  (Id. at 4); see 33
U.S.C. § 1365(b)(1)(A); 30 U.S.C. § 1270(b)(1)(A).  According to
plaintiffs, the EPA enforcement action "had little or no effect
on [defendants'] compliance with [their] effluent limitations,"
as evidenced by the fact that defendants' violations "have grown
more frequent after the settlement with EPA than they were before
EPA brought its enforcement action."  (Pls.' Mot. for Partial
Summ. J., Ex. 16, at 4).

        On April 27, 2010, 110 days after sending the NOI,
plaintiffs filed a fourteen-count complaint for declaratory and
injunctive relief and for civil penalties.  The complaint alleges
that between April 10, 2008 (the day after the Massey Consent
Decree became effective), and December 31, 2009, defendants
accrued at least 3,307 days of violations of the Clean Water Act
and SMCRA.  (Compl. ¶ 4).  Specifically, the complaint sets forth
the following claims for violations of the following WV/NPDES
permit numbers:

    Counts 1 and 2, Clean Water Act violations of and SMCRA
    violations related to No. WV1003968;

    Counts 3 and 4, Clean Water Act violations of and SMCRA
    violations related to No. WV1016024;

17

Counts 5 and 6, Clean Water Act violations of and SMCRA
violations related to No. WV1013301;

Counts 7 and 8, Clean Water Act violations of and SMCRA
violations related to No. WV1014838;

Counts 9 and 10, Clean Water Act violations of and
SMCRA violations related to No. WV1002040;

Counts 11 and 12, Clean Water Act violations of and
SMCRA violations related to No. WV1014587; and

Counts 13 and 14, Clean Water Act violations of and
SMCRA violations related to No. WV0091405.

(Id. ¶¶ 98-230).

Plaintiffs seek an order declaring that defendants have
violated and continue to violate the Clean Water Act and SMCRA;
enjoining defendants from operating their facilities in a manner
that will result in further violations of the effluent
limitations in these seven WV/NPDES permit numbers; directing
defendants to immediately comply with all effluent limitations,
monitoring and reporting requirements, and other terms and
conditions of the seven WV/NPDES permits; ordering defendants to
immediately comply with the terms and conditions of their WVSCMRA
permit numbers; ordering defendants to pay appropriate civil
penalties up to $32,500 per day for each violation that occurred
on or before January 12, 2009, and $37,500 per day for each
violation that occurred thereafter; ordering defendants to
conduct monitoring and sampling to determine the environmental

18

effects of their violations, to remedy and repair environmental
contamination and/or degradation caused by their violations, and
to restore the environment to its prior uncontaminated condition;
awarding plaintiffs' attorney and expert witness fees and all
other reasonable expenses incurred in pursuing this action; and
granting other such relief as the court deems just and proper.
(Compl. at 37-38).

On July 6, 2010, defendants moved for dismissal
pursuant to Federal Rule of Civil Procedure 12(b)(1).  Inasmuch
as each of the seven WV/NPDES permits referenced in plaintiffs'
complaint was also the subject of the EPA enforcement action and
the resulting Massey Consent Decree, defendants contend that
plaintiffs' citizen suit is precluded by the EPA's diligent
prosecution, pursuant to section 505(b)(1)(B), 33 U.S.C. §
1365(b)(1)(B).  Moreover, inasmuch as plaintiffs' SMCRA claims
are also predicated on alleged violations of effluent limitations
in defendants' WV/NPDES permits, defendants contend that allowing
plaintiffs' SMCRA claims would supersede, amend, modify, or
repeal the Clean Water Act, in contravention of section 702(a) of
SMCRA, 30 U.S.C. § 1292(a).  Accordingly, defendants assert that
plaintiffs' SMCRA claims must be dismissed as well.

III.

A.    Federal Rule of Civil Procedure 12(b)(1)

        Federal district courts are courts of limited subject
matter jurisdiction.  "They possess only the jurisdiction
authorized them by the United States Constitution and by federal
statute."  United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337,
347 (4th Cir. 2009).  As such, "there is no presumption that the
court has jurisdiction."  Pinkley, Inc. v. City of Frederick, 191
F.3d 394, 399 (4th Cir. 1999) (citing Lehigh Mining & Mfg. Co. v.
Kelly, 160 U.S. 327, 327 (1895)).  Indeed, when the existence of
subject matter jurisdiction over a claim is challenged under Rule
12(b)(1), "[t]he plaintiff has the burden of proving that subject
matter jurisdiction exists."  Evans v. B.F. Perkins Co., 166 F.3d
642, 647 (4th Cir. 1999); see also Richmond, Fredericksburg &
Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir.
1991).  If subject matter jurisdiction is lacking, the claim must
be dismissed.  See Arbaugh v. Y & H Corp., 546 U.S. 500, 506
(2006).

        In considering a challenge to its subject matter
jurisdiction, "the district court is to regard the pleadings as
mere evidence on the issue, and may consider evidence outside the

20

pleadings without converting the proceeding to one for summary judgment." Evans, 166 F.3d at 647 (quoting Richmond, Fredericksburg & Potomac, 945 F.2d at 768). While not converting a defendant's Rule 12(b)(1) motion to one for summary judgment, the district court "should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." Richmond, Fredericksburg & Potomac, 945 F.2d at 768. The moving party should prevail "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id.

B.   Section 505(b)(1)(B)

Section 505(b)(1)(B) of the Clean Water Act provides, in pertinent part, that "[n]o [citizen suit] may be commenced . . . if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action . . . to require compliance with [an effluent standard or limitation]." 33 U.S.C. § 1365(b)(1)(B). Stated differently, section 505(b)(1)(B) precludes a private citizen from initiating a citizen suit under the Clean Water Act if a governmental agency has already initiated and is diligently prosecuting an analogous enforcement action. As explained by our circuit court of appeals, "a [Clean

21

Water Act] enforcement prosecution will ordinarily be considered 'diligent' if the judicial action 'is capable of requiring compliance with the Act and is in good faith calculated to do so.'" <u>Piney Run Pres. Ass'n v. Carroll Cnty, Md.</u>, 523 F.3d 453, 459 (4th Cir. 2008) (quoting <u>Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.</u>, 382 F.3d 743, 760 (7th Cir. 2004)).

Importantly, the diligent prosecution exception set forth in section 505(b)(1)(B) reflects Congress' judgment that primary enforcement authority over the Clean Water Act ought to rest with the EPA and various state agencies, with citizen suits serving only "to supplement rather than to supplant governmental action." <u>Gwaltney of Smithfield v. Chesapeake Bay Found.</u>, 484 U.S. 49, 60 (1987). Indeed, Congress intended for citizen lawsuits under the Clean Water Act to have merely an "interstitial" role, so as not to intrude on agency discretion. <u>Id.</u> at 61. A court must be "particularly deferential to [an enforcement] agency's expertise" when presented with a consent decree, inasmuch as failure to defer to the agency's judgment can undermine agency strategy. <u>Piney Run Pres. Ass'n</u>, 523 F.3d at 459; <u>Karr v. Hefner</u>, 475 F.3d 1192, 1197 (10th Cir. 2007). As explained by the Tenth Circuit in <u>Karr</u>, "[i]f a defendant is

22

exposed to a citizen suit whenever the EPA grants it a concession, defendants will have little incentive to negotiate consent decrees." Karr, 475 F.3d at 1197. In such a situation, the EPA's "discretion to enforce the Act in the public interest would be curtailed considerably." Gwaltney, 484 U.S. at 61.

In support of their motion to dismiss, defendants contend that deference to the EPA warrants dismissal of plaintiffs' citizen suit. Specifically, defendants assert that the "EPA's discretion as the primary enforcer of the [Clean Water Act] will be undermined" if plaintiffs are allowed to proceed with the instant action. (Defs.' Mem. in Supp. 12). Defendants emphasize that the seven WV/NPDES permits at issue in plaintiffs' citizen suit were first the subject of the EPA enforcement action, and that the United States exercised discretion in resolving its enforcement action through the Decree. If this court were to allow plaintiffs' suit to continue, the argument goes, agency discretion will be significantly undermined, inasmuch as the EPA carefully selected injunctive relief and civil penalties calculated to bring about compliance with the Clean Water Act. Accordingly, defendants conclude that the court should defer to the United States and dismiss plaintiffs' citizen suit under section 505(b)(1)(B).

23

Defendants' contention that deference to the United States compels dismissal of plaintiffs' suit is critically undermined by the United States' own interpretation of the Massey Consent Decree. Plaintiffs in this action sought to intervene in the EPA enforcement action, as they were authorized to do under section 505(b) of the Clean Water Act. See 33 U.S.C. § 1365(b)(1)(B) (authorizing citizen to intervene as a matter of right when government enforcement action precludes citizen lawsuit). After the United States lodged the Decree in an effort to resolve the enforcement action, plaintiffs submitted public comments regarding the Decree's preclusive effect. Specifically, plaintiffs asked the United States to "[c]onfirm that the [Decree] does not prevent citizen suits against [the Massey defendants] for future violations of the Clean Water Act." See U.S. v. Massey Energy, Docket No. 56, at 11 (Mar. 18, 2008). In response, the United States reviewed the Decree's relevant provisions and concluded that "the Decree would not prevent the United States, States, or any other entities including citizens from pursuing violations that were not alleged in the Complaint or occurred after January 17, 2008, the date of lodging." Id. (emphasis added). Following this response, plaintiffs dropped their intervention requests, apparently satisfied that a citizen

24

suit remained a possibility in the event the Decree failed to bring about defendants' compliance with the Clean Water Act.

The United States' interpretation of the Massey Consent Decree is important, inasmuch as it indicates that the EPA considered the threat of subsequent enforcement actions, including citizen suits, an important tool in securing the Massey defendants' compliance with the Clean Water Act.  As the EPA is no doubt aware, citizen suits initiated in the wake of an agency's enforcement action can sometimes hinder any efforts to bring about compliance.  See Friends of Milwaukee's Rivers, 382 F.3d at 763 ("Levying additional penalties on violators who are undertaking massive remedial projects will not bring about compliance any faster or cause the result to be any more effective – it will just cause the result to be more expensively arrived at."); N. & S. Rivers Watershed Ass'n v. Scituate, 949 F.2d 552, 557 (1st Cir. 1991) ("Duplicative actions aimed at exacting financial penalties in the name of environmental protection at a time when remedial measures are well underway do not further [the goals of the Clean Water Act].  They are, in fact, impediments to environmental remedy efforts.").  Had the EPA believed that a future citizen suit against the Massey defendants would hinder its ability to bring an end to their

25

unlawful discharges, it would have neither negotiated a consent decree that contemplated citizen suits nor assured putative interveners that such suits were available in the event the violations continued.  The EPA did both here, suggesting that it considered the threat of future citizen suits necessary to achieve compliance.  This is precisely the type of discretionary matter to which a court should defer.

To be certain, an agency's own conclusion regarding the preclusive effect of its enforcement efforts should not be accepted at face value.  See Friends of Milwaukee's Rivers, 382 F.3d at 760 ("[A] diligent prosecution analysis requires more than mere acceptance at face value of the potentially self-serving statements of a state agency and the violator with whom it settled regarding their intent with respect to the effect of the settlement.").  Over-reliance on an agency's interpretation is more of a concern, however, in instances where the agency, for whatever reason, concludes that its less-than-diligent prosecution efforts should preclude a citizen suit.  Accepting the agency's conclusion in such circumstances virtually ensures that the violator's non-compliance with the Clean Water Act will continue.  But where, as here, the agency concludes that its enforcement efforts would not be hindered by a subsequent citizen

suit, a court should be particularly hesitant to conclude otherwise, inasmuch as the agency may well have depended on the threat of a citizen suit in crafting the terms of any settlement agreement.

Nor does it appear that allowing plaintiffs to proceed with their citizen suit will somehow impede the EPA's ability to resolve future enforcement actions by way of settlement.  <u>See</u> <u>Piney Run Pres.</u>, 523 F.3d at 459 (instructing that courts should be "particularly deferential" when faced with consent decree so as not to undermine government's ability to reach voluntary settlements with alleged violators).  The Massey Consent Decree, which was the product of "lengthy negotiations," made abundantly clear that defendants' compliance therewith did not immunize them from future enforcement proceedings, including citizen suits. <u>See</u> Consent Decree ¶¶ 90-91.  Thus, it cannot be said that allowing plaintiffs' citizen suit to proceed somehow exposes defendants to additional penalties they had not expected, rendering them adverse to any future settlement efforts.  To the contrary, the EPA's ability to negotiate settlements with alleged offenders might actually be hindered by the dismissal of plaintiffs' civil suit.  Plaintiffs and other environmental groups often intervene in the government's prosecution efforts.

27

As evidenced by the EPA enforcement action, such putative interveners depend on the government's assurances that its settlement efforts will not preclude future citizen suits.  If courts were to interpret section 505(b)(1)(B) in such a way as to preclude citizen suits notwithstanding the government's determination that such suits should be allowed, environmental groups may well decline to support the government's settlement efforts.

In short, this is an occasion where deference to the government militates against dismissal of a citizen suit.  The United States and the Massey defendants negotiated a consent decree that left open the possibility of citizen suits, a fact emphasized by the United States in resolving the EPA enforcement action.  To ignore the United States' determination that the Massey Consent Decree does not preclude future citizen suits would not only be unjust to plaintiffs, who relied on that interpretation in dropping their intervention requests, it would completely undermine the government's discretion in drafting the Decree's terms.  Accordingly, plaintiffs' Clean Water Act claims

are not precluded by section 505(b)(1)(B), and the court is possessed of subject matter jurisdiction.[10]

                              IV.

        It is accordingly ORDERED that defendants' motion to dismiss be, and it hereby is, denied.

        The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.

                              DATED: November 23, 2010

                              _____
                              John T. Copenhaver, Jr.
                              United States District Judge

---

        [10] Inasmuch as plaintiffs' Clean Water Act claims are not precluded, neither are their SMCRA claims, which also incorporate the effluent limitations contained in the WV/NPDES permits.  "In practical effect, the relief sought by the plaintiffs under SMCRA is duplicative of that sought under the [Clean Water Act], and allowing SMCRA claims to proceed can not be said to, "alter[] in any fashion the [Clean Water Act]."  Sierra Club v. Powellton Coal Co., LLC, 662 F. Supp. 2d 514, 533-34 (S.D. W. Va. 2009).