**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

**SIERRA CLUB, WEST VIRGINIA
HIGHLANDS CONSERVANCY,
OHIO VALLEY ENVIRONMENTAL
COALITION, and COAL RIVER
MOUNTAIN WATCH,**

> **Plaintiffs,**

**v.**                                          **CIVIL ACTION NO. 2:10-cv-00673
                                                Hon. John T. Copenhaver, Jr.**

**ELK RUN COAL COMPANY, INC.,
INDEPENDENCE COAL COMPANY, INC.,
MARFORK COAL COMPANY, INC.,
PEERLESS EAGLE COAL COMPANY,
and POWER MOUNTAIN COAL COMPANY,**

> **Defendants.**

**<u>CONSENT DECREE</u>**

**I.  RECITALS**

1.     On April 27, 2010, Plaintiffs the Sierra Club, West Virginia Highlands Conservancy, Ohio Valley Environmental Coalition, and Coal River Mountain Watch (collectively "Plaintiffs") filed a Complaint for Declaratory and Injunctive Relief and for Civil Penalties in this civil action against Defendants Elk Run Coal Company, Inc., Independence Coal Company, Inc., Marfork Coal Company, Inc., Peerless Eagle Coal Company, and Power Mountain Coal Company ("Defendants").

2.     The Complaint alleged that Defendants had discharged concentrations of pollutants in excess of the effluent limits for those parameters contained in West Virginia/National Pollution Discharge Elimination System ("WV/NPDES") Permit Nos.

WV1003968, WV1016024, WV1013301, WV1014838, WV1002040, WV1014587, and WV0091405 issued to Defendants by the West Virginia Department of Environmental Protection ("WVDEP") pursuant to Section 402 of the federal Clean Water Act ("CWA") and the West Virginia Water Pollution Control Act.  The Complaint further alleged that Defendants' discharges of pollutants in concentrations exceeding those permitted by its WV/NPDES permits constituted a violation of the performance standards under the federal Surface Mining Control and Reclamation Act of 1977 ("SMCRA")

3.     The Parties recognize, and the Court by entering this Consent Decree finds, that the Consent Decree has been negotiated by the Parties in good faith and will avoid further litigation among the Parties, and that this Decree is fair, reasonable and in the public interest.

NOW, THEREFORE, with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED AND DECREED as follows:

## II.  JURISDICTION AND VENUE

4.     This Court has jurisdiction over the Parties and over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 33 U.S.C. § 1365 (CWA citizen suit provision) and 30 U.S.C. § 1270 (SMCRA citizen suit provision).

5.     Venue is proper in the Southern District of West Virginia pursuant to 28 U.S.C. § 1391(b) and (c), because it is the judicial district in which Defendants are located, reside and/or do business, and/or in which the violations in the Complaint occurred, as well as 33 U.S.C. § 1365(c)(1), because the sources of the CWA violations are located in this judicial district, and 30 U.S.C. § 1270(c), because the coal mining operations complained of are located in this judicial district.

6.     For purposes of this Consent Decree, or any action to enforce this Consent Decree, Defendants consent to this Court's jurisdiction over this Consent Decree and consent to venue in this judicial district.

### III.   APPLICABILITY

7.      The provisions of this Consent Decree apply to and are binding upon Plaintiffs, upon Defendants and any of their respective successors and/or assigns, and upon other persons or entities otherwise bound by the law.

8.      No transfer of ownership or operation of any Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendants of their obligation to ensure that the terms of this Consent Decree are implemented.  Prior to any transfer, Defendants shall provide a copy of this Consent Decree to the proposed transferee and require the transferee to provide written confirmation acknowledging the terms of the Consent Decree.

9.      Defendants shall provide a copy of this Consent Decree to all officers, employees and agents whose duties include compliance with any provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree.

### IV.   DEFINITIONS

10.      Terms used in this Consent Decree that are defined in the CWA, SMCRA or in regulations issued pursuant thereto shall have the meanings assigned to them therein, unless otherwise provided in this Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.      "Complaint" shall mean the Complaint for Declaratory and Injunctive Relief filed by Plaintiffs in this action on April 27, 2010;

b.      "Consent Decree" or "Decree" shall mean this Consent Decree and the appendices attached hereto;

c.      "Daily maximum violation" shall mean an exceedance of the effective daily maximum effluent limit of the applicable WV/NPDES Permit.

d.      "Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday or federal holiday, the period shall run until the close of business of the next business day;

e.      "DMR" means a Discharge Monitoring Report for one of the WV/NPDES permits identified herein;

f.      "Effective Date" shall have the definition provided in Section XV;

g.      "Facility" or "Facilities" shall mean Defendants' mining operations subject to WV/NPDES Permit Nos. WV1003968, WV1016024, WV1013301, WV1014838, WV1002040, WV1014587, and WV0091405;

h.      "In-stream pond" shall mean a permitted WV/NPDES outlet from which the effluent is discharged directly into the receiving stream.  For purposes of determining any stipulated penalty, each of the following outlets, shall be considered an "in-stream pond":

    i.      Outlet 002 of WV/NPDES Permit WV1003968;

    ii.     Outlet 003 of WV/NPDES Permit WV1003968;

    iii.    Outlet 004 of WV/NPDES Permit WV1003968;

    iv.     Outlet 017 of WV/NPDES Permit WV1003968;

    v.      Outlet 033 of WV/NPDES Permit WV1014587;

    vi.     Outlet 001 of WV/NPDES Permit WV0091405;

i.      "Maximum daily effluent limit" shall mean maximum daily discharge limitation as defined in 40 C.F.R. § 122.2;

j.      "Monthly average effluent limit" shall mean average monthly discharge limitation as defined in 40 C.F.R. § 122.2;

k.     "Monthly average violation" shall mean an exceedance of the effective monthly average effluent limit of the applicable WV/NPDES Permit;

l.     "On-bench outlet" shall mean a permitted WV/NPDES outlet from which the discharged effluent must travel overland for some distance before reaching the receiving stream.  For purposes of determining any stipulated penalty, each of the following outlets, shall be considered an "on-bench outlet":

    i.     Outlet 021 of WV/NPDES Permit WV1016024;

    ii.    Outlet 004 of WV/NPDES Permit WV1002040;

    iii.   Outlet 013 of WV/NPDES Permit WV1014587;

    iv.    Outlet 005 of WV/NPDES Permit WV0091405;

m.     "Outlet" or "Outfall" shall mean a WV/NPDES-permitted discharge point where monitoring and sampling is conducted pursuant to a WV/NPDES permit;

n.     "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

o.     "Parties" shall mean Plaintiffs and Defendants;

p.     "Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

q.     "State" shall mean the State of West Virginia;

r.     "USEPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

s.     "WVDEP" shall mean the West Virginia Department of Environmental Protection;

t.      "WV/NPDES permit" shall mean a West Virginia / National Pollutant Discharge Elimination System permit issued by WVDEP pursuant to Section 402 of the CWA.

## V. CIVIL PENALTY

11.     Defendants shall pay a civil penalty in the amount of $ 40,000.00 to the United States as set forth in Paragraph 12 below.  Together with the Supplemental Environmental Project to be funded as set forth in Section VI, the payment of this civil penalty is made in settlement of all of Plaintiffs' claims in this action under the CWA and SMCRA for effluent limit violations occurring prior to the effective date of this Consent Decree.

12.     Defendants shall pay the civil penalty due to the United States Treasury within thirty (30) days of the entry of this Decree.  That payment shall be made by certified check, bank check, or money order to the Treasurer of the United States and should be sent to the following address: Debt Collection Specialist, Environment and Natural Resources Division, Executive Office, PO Box 7754, Ben Franklin Station, Washington D.C. 20044-7754.  The check or money order shall reference *Sierra Club et al. v. Elk Run Coal Company, Inc. et al.*, Civil Action No. 2:10-cv-0673, and payment shall be considered paid upon mailing, or direct delivery to the specified address.  A copy of the check and cover letter shall be sent to Plaintiffs at the time payment is made, and shall state that payment is being made pursuant to this Decree.

13.     The sum set forth in Paragraph 11, supra, shall completely discharge Defendants from any liability under 33 U.S.C. § 1365 and 30 U.S.C. § 1270 arising from any violations of WV/NPDES Permit Nos. WV1003968, WV1016024, WV1013301, WV1014838, WV1002040, WV1014587, and WV0091405 that have occurred or may occur up to and including the date of entry of this Consent Decree.

14.     Defendants shall not deduct any penalties paid under this Consent Decree pursuant to this Section in calculating its federal, state or local income tax.

## VI.   SUPPLEMENTAL ENVIRONMENTAL PROJECT

15.     In addition to the civil penalty set forth in Section V, supra, Defendants shall pay a total of $ 400,000.00 to the West Virginia Land Trust in order to fund a Supplemental Environmental Project ("SEP") that will complement a SEP previously funded in part by the settlement reached by Consent Decree in *Sierra Club, et al. v. Powellton Coal Company, LLC*, Civil Action No. 2:08-cv-1363.

16.     The SEP funds will support the West Virginia Land Trust in its efforts to conserve property of special significance in perpetuity. Appendix A to this Consent Decree describes the Project at the West Virginia Land Trust, its four-year budget, how it will assess and report its performance, and how the Clinic relates to the terms of USEPA's Supplemental Environmental Projects Policy.

17.     The SEP will have a significant impact on the communities in the Coal River, Elk River, and Gauley River watersheds and the watersheds themselves.  Portions of the Gauley River are under the jurisdiction of the National Park Service: the Gauley River National Recreation Area.

18.     These communities would benefit from additional legal resources to protect their land and water. This SEP will build capacity within the rural communities in the geographic area to protect the riparian areas crucial to the preservation of their ground and surface water.

19.     Defendants shall remit the funds identified in this Paragraph by certified check, bank check, or money order to the West Virginia Land Trust within thirty (30) days of the entry of this Decree and shall send the funds to the following address:

> West Virginia Land Trust
> PO Box 11823
> Charleston, WV 25339-1823

The check or money order shall reference *Sierra Club et al. v. Elk Run Coal Company, Inc. et al.,* Civil Action No. 2:10-cv-0673, and payment shall be considered paid upon mailing, or direct delivery to the specified address.  A copy of the check and cover letter shall be sent to Plaintiffs at the time payment is made, and shall state that payment is being made pursuant to this Decree.

20.     Defendants shall not deduct its contribution to the SEP or any payments made pursuant to Section IX ("Stipulated Payments") in calculating its federal, state or local income tax.

## VII.   COMPLIANCE REQUIREMENTS

21.     This Consent Decree in no way affects or relieves Defendants of their responsibility to comply with applicable federal, state and local laws, regulations and permits.

22.     Where any compliance obligation under this Section requires Defendants to obtain a federal, state or local permit or approval, Defendants shall submit timely and substantially complete applications and take all other actions necessary to obtain all such permits or approvals. Defendants may seek relief under the provisions of Section X of this Consent Decree ("Force Majeure") for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely and substantially complete applications and have taken all other actions necessary to obtain all such permits or approvals.

## VIII.   REPORTING REQUIREMENTS

23.     Defendants shall submit quarterly reports within 30 Days after the end of each calendar-year quarter (i.e., by April 30, July 31, October 31, and January 31) after the Effective Date of this Consent Decree until Termination of this Decree pursuant to Section XVIII.  Each written quarterly report shall include, for the preceding quarter:

a.      Any exceedances of NPDES permit limits for aluminum for WV/NPDES Permit Nos. WV1003968, WV1016024, WV1013301, WV1014838, WV1002040, WV1014587, and WV0091405, including DMRs and NOVs.  An exceedance of NPDES permit limits for aluminum means an exceedance of the aluminum limits under Paragraphs 32 and 33 of this Consent Decree.  Additionally, to the extent that Section IX, Paragraph 43, subsection (b) of the Consent Decree in *U.S. v. Massey Energy Co., et al.*, Civil Action No. 2:07-cv-299 (S.D. W. Va. Apr. 9, 2008) requires the submittal of reports documenting aluminum exceedances for the aforementioned WV/NPDES permits, Defendants may submit duplicates of the relevant portions of these reports; and

b.      A description of violation of this Consent Decree for which Defendants have submitted to Plaintiffs an unresolved Force Majeure claim or intends to submit a Force Majeure claim pursuant to Section X of this Consent Decree.

24.     All reports shall be submitted to the persons designated in Section XIII of this Consent Decree ("Notices").

25.     The reporting requirements of this Consent Decree do not relieve Defendants of any reporting obligation required by the CWA, SMCRA or their implementing regulations, or by any other federal, state or local law, regulation, permit or other requirement.

26.     Any information provided pursuant to this Consent Decree may be used by Plaintiffs in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

### IX.  STIPULATED PAYMENTS

27.     Defendants shall be liable for stipulated payments for violations as specified below, unless excused under Section X ("Force Majeure").

28.     Stipulated payments shall be paid to the West Virginia University College of Law to provide further funding to the West Virginia Land Trust identified in the SEP described in Section VI.

29.     Accrued stipulated payments shall be satisfied in full through payment as set forth in Paragraphs 28 and 34.

30.     A daily maximum violation or monthly average violation as reported on Defendants' DMRs shall constitute one (1) violation for purposes of this Section.

31.     Plaintiffs may, in the unreviewable exercise of their discretion, reduce or waive stipulated payments otherwise due under this Consent Decree.

32.     <u>Noncompliance with NPDES permit limits for aluminum prior to Revised Aluminum Translator Studies</u>. The following stipulated payments shall accrue per violation for each reported daily maximum violation or monthly average violation on Defendants' DMRs for the "translated" aluminum parameters and the outlets identified in Appendix B through WVDEP's final actions on applications for revised aluminum translators as set out in paragraph 33.

a.     For each in-stream pond daily maximum violation: (i) $2000 for the first year following the Effective Date of this Consent Decree; and (ii) $4000 for the second year following the Effective Date of this Consent Decree.

b.     For each in-stream pond monthly average violation: (i) $3000 for the first year following the Effective Date of this Consent Decree; and (ii) $6000 for the second year following the Effective Date of this Consent Decree.  For the purposes of this Decree, if the average of the data submitted in discharge monitoring reports for a particular outlet exceeds the monthly average limit, then that exceedance shall be considered a single violation.

c.　　For each on-bench outlet pond daily maximum violation: (i) $1000 for the first year following the Effective Date of this Consent Decree; and (ii) $2500 for the second year following the Effective Date of this Consent Decree.

d.　　For each on-bench outlet monthly average violation: (i) $2000 for the first year following the Effective Date of this Consent Decree; and (ii) $5000 for the second year following the Effective Date of this Consent Decree.

33.　　<u>Noncompliance with NPDES permit limits for aluminum after action on applications for revised aluminum translators</u>: Defendants shall diligently pursue the submission of new aluminum translators for the outlets listed in Appendix B. The parties anticipate that Defendants can submit to WVDEP applications for new translators on Permit Nos. WV1003968 and WV1016024 by July 1, 2011 and for Permit Nos. WV1002040, WV1014587 and WV0091405 no later than March 1, 2012. Provided Defendants diligently pursue applications for revised translators, then the stipulated payments set out in Paragraph 32 shall accrue per violation for each reported daily maximum violation or monthly average violation on Defendants' DMRs for the translated aluminum parameters and the outlets identified in Appendix B until WVDEP approves new limits by way of major modification. However, if EPA objects to major modifications for new "translated" parameters then the stipulated penalties will continue to accrue per violation for each reported daily maximum violation or monthly average violation on Defendants' DMRs for the "translated" parameters until a final permit decision is made by either WVDEP or EPA. Additionally, Plaintiffs agree not to challenge the modifications to re-apply translators on anti-backsliding grounds, but otherwise reserve all rights to challenge them.

34.     Defendants shall submit stipulated payments due as a result of noncompliance under Paragraph 32 and 33 at the end the 30 Day period following the conclusion of each calendar quarter (i.e., by April 30, July 31, October 31 and January 31).  Defendants shall make payments to the West Virginia Land Trust following the procedure specified in Section VI herein. Notice of such payment shall be sent to Plaintiffs with Defendants' quarterly reports required by Paragraph 23.

35     For violations of the effluent limitations that have occurred or do occur between September 30, 2010, and the entry of this Decree, Defendant will pay stipulated payments in the manner provided in Paragraph 28, 32, and 33, as those violations have occurred prior to November 1, 2011.

## X.   FORCE MAJEURE

36.     "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors, which delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible. "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

37.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic or facsimile transmission to Plaintiffs within five (5) days of when Defendants first knew that the event might cause a delay. Within 14

Days thereafter, Defendants shall provide in writing to Plaintiffs an explanation of the reasons for the delay; the anticipated duration of the delay; and actions taken or to be taken to prevent or minimize the delay.

38.     If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by Plaintiffs for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation.  Plaintiffs will notify Defendants in writing within 5 days of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

39.     If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of its decision with five (5) days of its receipt of the Force Majeure claim by Defendants.

## XI.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

40.     This Consent Decree resolves the civil claims of Plaintiffs for the violations alleged in the Complaint in this action, filed on April 27, 2010, through the date of lodging.

41.     This Consent Decree resolves all legal and equitable claims of Plaintiffs for all violations of aluminum in DMRs for WV/NPDES Permit Nos. WV1003968, WV1016024, WV1013301, WV1014838, WV1002040, WV1014587, and WV0091405 through the date of lodging and for two (2) years following the date of lodging.

42.     Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations or permits, except as set forth herein. Plaintiffs do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree shall result in

compliance with provisions of the Act, 33 U.S.C. § 1311, et seq., or with any other provisions of federal, state or local laws, regulations or permits.

43.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XII. COSTS

44.     Defendants shall pay reasonable costs and attorneys' fees, including expert witness fees and costs incurred by Plaintiffs in conjunction with this civil action through the Effective Date of this Consent Decree, in accordance with the fee-shifting provisions of the CWA and SMCRA.  The Parties have agreed that those costs and fees total $ 76,478.00.  Of that amount, $ 54,175 is for Plaintiffs' reasonable attorneys' fees, allocated as follows:

     a.     $28,380 for Derek Teaney's 132 hours at the reasonable rate of $215/hour; and

     b.     $14,070 for Joseph Lovett's 42 hours at the reasonable rate of $335/hour.

     c.     $4,725 for Jennifer Chavez's 27 hours at the reasonable rate of $175/hour.

     d.     $7,000 for Jim Hecker's 20 hours at the reasonable rate of $350/hour.

In addition to attorney fees, Plaintiffs' costs and expert expenses were $22,303.

45.     Not later than twenty (20) days from the entry of this Consent Decree, Defendants shall deliver to Plaintiffs' counsel a check for $ 76,478.00 made payable to the Appalachian Center for the Economy and the Environment, Inc.  The Appalachian Center for the Economy and the Environment, Inc., shall be wholly responsible for the proper distribution of any portions of the delivered sum to any and all other attorneys, experts or other entities who may be entitled thereto.  The sum delivered under this paragraph shall be a complete settlement of Plaintiffs'

claims for costs and fees incurred up to the Effective Date of this Consent Decree, and thereafter for responding to possible comments on this Decree by the Department of Justice.

46.    Plaintiffs retain the right to seek costs, including attorneys' and expert witness fees, for their work related to (a) monitoring Defendants' compliance with the Decree, and (b) proceedings to interpret or enforce the terms of the Decree.

## XIII.  NOTICES

47.    Unless otherwise specified herein, whenever notifications, submissions, reports or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

To Plaintiffs:

Derek Teaney
Appalachian Center for the Economy and the Environment
P.O. Box 507
Lewisburg, WV 24901

To Defendants:

Thomas Cook (or successor), Director
Environmental Affairs
Massey Energy
300 Morgan Massey Drive
P.O. Box 261
Julian, WV 25529

With a copy to:
Legal Department
M. Shane Harvey (or successor)
Vice President and General Counsel
Massey Coal Services, Inc.
300 Morgan Massey Drive
P.O. Box 261
Julian, WV 25529

48.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

49.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XIV.   EFFECTIVE DATE

50.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XV.   RETENTION OF JURISDICTION

51.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Section XVI ("Modification") or effectuating or enforcing compliance with the terms of this Decree.

52.     Plaintiffs and Defendants reserve all legal and equitable rights and defenses available to them to enforce or defend the provisions of this Consent Decree.  Before a Party invokes the Court's jurisdiction to interpret, enforce or modify this Decree, the Party shall send a written notice to the other Party outlining the nature of the matter and requesting informal negotiations among the principals and counsel to resolve the matter.  If the Parties are unable to resolve the matter within 30 days from the date of the notice (or within an additional period of time agreed to by the Parties), any Party may request the Court to resolve the matter.

## XVI.   MODIFICATION

53.     The terms of this Consent Decree, including the attached appendices, may be modified only by a subsequent written agreement signed by all Parties.  Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

## XVII.   TERMINATION

54.     This Consent Decree shall terminate automatically two (2) years from the Effective Date of this Decree.

## XVIII.   SIGNATORIES/SERVICE

55.     Each undersigned representative of Plaintiffs and Defendants certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

56.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.

## XIX.   INTEGRATION

57.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.   Other than deliverables that are subsequently submitted and approved pursuant to this Decree, no other document, nor any representation, inducement, agreement, understanding or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XX.   FINAL JUDGMENT

58.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to Plaintiffs and Defendants.   The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXI.   APPENDICES

59.     The following appendices are attached to and part of this Consent Decree:

Appendix A — Description of SEP Funding of the West Virginia Land Trust Riparian Preservation Project

Appendix B — Chart of relevant WV/NPDES permits and outfalls with "pre-translated" aluminum limits and "translated" aluminum limits.

ENTER: _____, 2011

_____

JOHN T. COPENHAVER, JR.
UNITED STATES DISTRICT JUDGE

For the Plaintiffs Sierra Club, West Virginia Highlands Conservancy, Ohio Valley Environmental Coalition, and Coal River Mountain Watch

Dated: May 11, 2011 _____        **/s/ Derek O. Teaney**
                                      DEREK O. TEANEY (WV Bar No. 10223)
                                      Appalachian Center for the Economy and the Environment
                                      P.O. Box 507
                                      Lewisburg, WV 24901
                                      304-793-9007

For the Defendants Elk Run Coal Company, Inc., Independence Coal Company, Inc., Marfork Coal Company, Inc., Peerless Eagle Coal Company, and Power Mountain Coal Company

Dated: May 11, 2011 _____        **/s/ Robert G. McLusky**
                                      ROBERT G. McLUSKY, WVBN 2489
                                      MATTHEW S. TYREE, WVBN 11160
                                      JACKSON KELLY, PLLC
                                      1600 Laidley Tower
                                      Post Office Box 553
                                      Charleston, West Virginia 25322
                                      304-340-1381

<u>APPENDIX A</u>

WEST VIRGINIA LAND TRUST RIPARIAN PRESERVATION PROJECT

<u>OVERVIEW OF THE WEST VIRGINIA LAND TRUST</u>

The WVLT is the <u>only</u> statewide land trust in West Virginia and thus, has flexibility to work in all areas of the state. It is a private nonprofit charitable 501 ( c ) 3 corporation governed by a volunteer board of directors.

In evaluating properties for protection, the WVLT generally focuses on the following criteria:

**Size:** The WVLT typically selects projects that are 50 acres or larger. In certain situations, small projects can have significance. The WVLT staff and board will work to determine value of small projects, and to accept, decline, or assist in alternative partnerships.

**Location:** the WVLT prefers to increase the total protected areas in WV by focusing on protecting land that <u>adjoins</u> protected space (e.g., federal, state, local forest/park or trail or is protected by a conservation organization).

**Use:** the WVLT finds value in preserving lands that serve a purpose or have a use that is consistent with local, state, or federal plans (e.g., conservation programs, master plans, farmland protection plans, a designated scenic highway, or a watershed protection program).

**Environmental Features:** including, but not limited to:
- Ecologically important water frontage on a body of water such as a lake, river or stream.
- Wetlands or floodplain or other lands important to water quality.
- Habitat for, and/or has an occurrence of rare, threatened, or endangered species.
- Important wildlife habitat or corridor, as identified by wildlife experts.
- Exemplary natural ecosystem such as old forest growth or shale barren.
- Contains prime/unique agricultural soils and is in active agricultural production.
- Contains mature forest with a variety of species sufficient to support a productive forest.

**Other Features:** including, but not limited to:
- Access to significant public recreational opportunities.
- Opportunities for outdoor education or scientific research and offers public access to scenic view.
- Scenic view from a public road, trail, river, or lake.
- Historical value (listed or is eligible to be listed with the National Register of Historic Places).
- Enhances the scenic value of significant natural, cultural, or historic sites.
- Makes a significant contribution to the rural character of a town, county, or the state.

PROJECT GOALS

The West Virginia Land Trust (WVLT), working in close partnership with the West Virginia College of Law's Land Use and Sustainable Development Clinic (LUSDC), proposes to develop a Riparian Area Preservation Project as a Supplemental Environmental Project (SEP). The two organizations will work collaboratively to achieve the following goals:

1) Identification of properties with ecological significance, including riparian areas, in the watersheds affected by the discharges at issue in this litigation (Coal, Elk and Gauley).

The WVLT will work with various governmental and private conservation agencies and organizations such as The Nature Conservancy, WV Department of Natural Resources and the Division of Forestry, National Park Service, The Trust for Public Land, and the National Committee on the New River, to analyze and prioritize areas of high conservation value.

The LUSDC will work with local governments and planning commissions to identify lands of a sensitive nature that are consistent with the goals of the project, and that can be incorporated into a community land use or conservation plan.

Working with these groups we will identify property owners and tracts of land that are a high priority for inclusion in this program.

2) Educate land owners and communities in the affected watersheds about land conservation.

The WVLT will deploy a part time education and outreach coordinator in the watershed communities.  We will work in conjunction with the LUSDC and other conservation resource partners on an as needed basis to bring expertise and information to communities and land owners.  Outreach efforts will focus on:

1) Educational sessions to inform residents and land owners about conservation programs, easements, etc.

2) Meetings with local farmland protection boards, watershed associations and other conservation and citizen groups to explain the project goals and to seek assistance in the identification of properties that meet the project criteria.

3) Comprehensive land use planning for communities including benefits, required procedures, developing the process for community input, etc.

4)  One-on- one meetings with property owners to answer questions and gain commitments to donate conservation easements.

3)  Develop voluntary conservation easements to protect properties within the affected watersheds.

The WVLT and LUSDC will pursue donated conservation easements from interested property owners within the watersheds.  It is assumed that easements will be donated to the WVLT and not purchased.  If there is an exceptional project which requires the purchase of an easement, the WVLT will evaluate its budget position in relation to the importance and conservation values associated with the project.  If needed, the WVLT will use SEP funds as available or approach one if its conservation partners or funders (such as the Outdoor Heritage Conservation Fund) for assistance with the purchase price.  There are a variety of transaction costs associated with documenting and closing easements including appraisals, surveys, environmental assessments, geology reports, title research, a review of mineral rights and ownership, and documentation of the property's baseline conservation values. While the above activities are underway, the easement language is negotiated and developed between the WVLT and the property owner.

The LUSDC will be a critical resource throughout this entire process.  While ensuring that there are no conflicts of interest, the LUSDC will provide legal advice and services on many of the due diligence items, as well as potentially represent land owners or the WVLT in the crafting of the actual easement language and documents.

4)  Fund the Stewardship, Monitoring and Defense Fund necessary to monitor and enforce the conservation easements in perpetuity.

As a member of the Land Trust Alliance, the WVLT follows national best practices standards and requires that landowners who donate conservation easements contribute to our Stewardship and Defense Fund. These funds are pooled and invested according to the WVLT Investment Management Policy. The purpose of the fund is to offset the costs anticipated from holding easements in perpetuity including annual monitoring, staff time, and possible legal defense.  The base rate for any easement donation is $7,500.  Increases are calculated and added to the base rate according to the property size, easement type, complexity of easement terms, and the estimated annual stewardship and administrative hours necessary to steward the property.  The endowment is typically a major barrier for land owners wishing to donate an easement. By using SEP funds, a major impediment will be removed. The LUSDC will play a critical role in advising on the defense of WVLT-held easements, but will not engage in litigation on behalf of the WVLT and/or land owners if and when there is a possible violation.

5)  Neither the WVLT nor the LUSDC shall use any funds from this Project for the purposes of soliciting or acquiring conservation easements for the purpose of

blocking future mining operations.

ASSESSMENT CRITERIA AND REPORTING SCHEDULE

The West Virginia Land Trust will report semi-annually to the United States Department of Justice. Assessment, based on the Project's goals and four-year projected funding as a SEP, will include:

- Narrative of actions taken toward fulfillment of each goal statement.
- Expenditure of SEP and matching funds to date.

After two years of full operation of the Project, the semi-annual reports will also include metrics of results including:

- number of acres preserved;

- number of property owners receiving information and/or assistance with land conservation; and

- number of educational sessions delivered to communities.

BUDGET

The following represents a four year total budget for the WVLT's portion of the project.

| Line Item | SEP Contribution | Notes |
|---|---|---|
| Personnel & Overhead | $70,000 | *The WVLT will manage the start up of the project, develop annual work plans, coordinate the closing of all easements, and provide quality control for the WVLT's portion of the project.* |
| Outreach & Education | $100,000 | *Supports the employment of a part-time outreach coordinator that will focus 100% on the project; community outreach materials, travel, educational sessions* |
| Transaction Costs | $124,000 | *Documentation of conservation values; surveys; environmental assessments; geology reports; appraisals, etc.* |

| Stewardship, Monitoring & Defense Fund | $106,000 | *Required restricted funding for legal defense and stewardship in perpetuity* |
|---|---|---|
|  |  |  |
| Total | $400,000 |  |

APPENDIX B

| Permit No. | Outlet No. | In-stream Pond vs. On-bench Outlet | Pre-translated Aluminum Daily Limit (mg/l) | Pre-translated Aluminum Monthly Limit (mg/l) | Translated Aluminum Daily Limit (mg/l) | Translated Aluminum Monthly Limit (mg/l) |
|---|---|---|---|---|---|---|
| WV1003968 | 002 | In-stream | 0.75 | 0.43 | 1.274 | 1.246 |
| WV1003968 | 003 | In-stream | 0.75 | 0.43 | 1.274 | 1.246 |
| WV1003968 | 004 | In-stream | 0.75 | 0.43 | 1.274 | 1.246 |
| WV1003968 | 017 | In-stream | 0.75 | 0.43 | 1.274 | 1.246 |
| WV1016024 | 021 | On-bench | 0.75 | 0.43 | 5.125 | 2.939 |
| WV1002040 | 004 | On-bench | 0.75 | 0.43 | 1.47 | 0.84 |
| WV1014587 | 013 | On-bench | 0.75 | 0.43 | 1.57 | 0.90 |
| WV1014587 | 033 | In-stream | 0.75 | 0.43 | 5.49 | 3.15 |
| WV0091405 | 001 | In-stream | 0.75 | 0.43 | 2.02 | 1.16 |
| WV0091405 | 005 | On-bench | 0.08 | 0.14 | 2.02 | 1.16 |